UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LESLIE JOSEPH SILVA, | Case No. 07-CV-0537-WQH (JMA) |
| Petitioner, | **REPORT AND RECOMMENDATION OF** |
| v. | **UNITED STATES MAGISTRATE JUDGE** |
| | **ON PETITION FOR WRIT OF HABEAS** |
| J. YATES, Warden, et al., | **CORPUS** |
| Respondent. | |

**I.   Introduction**

On March 22, 2007, Leslie Joseph Silva ("Petitioner"), a state prisoner proceeding pro se, filed a Petition for Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254. [Doc. No. 1.] On May 24, 2007, Petitioner filed a First Amended Petition (hereinafter the "Petition"). [Doc. No. 4.] The Petition challenges his San Diego Superior Court conviction in case number SCD 175694 for ten counts consisting of three counts of forcible rape, two counts of forcible sodomy, one count of forcible oral copulation, two counts of residential burglary, and two counts of misdemeanor indecent exposure. (Lodgment No. 1, Clerk's Transcript ("CT"), at 15-20, 293-95.) Petitioner contends: (1)

the trial court erred in refusing to sever the counts, resulting in a fundamentally unfair trial, and (2) trial counsel was constitutionally ineffective.  (<u>See</u> Petition, Grounds One and Two at 6-7.)

This Court has considered the Petition, Respondent's Answer, and all the supporting documents submitted by the parties.  Based upon the documents and evidence presented in this case, and for the reasons set forth below, the Court recommends the Petition be **DENIED**.

## II.   <u>Factual Background</u>

This Court gives deference to state court findings of fact and presumes them to be correct.  Petitioner may rebut the presumption of correctness, but only by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); <u>see also</u> <u>Parke v. Raley</u>, 506 U.S. 20, 35-36 (1992) (holding findings of historical fact, including inferences properly drawn from such facts, are entitled to statutory presumption of correctness).  The facts as found by the state appellate court are as follows:

*Offenses Against Cynthia B. - Counts 1 through 4*

[¶] On May 29, 2002, Cynthia B. fell asleep after forgetting to close her garage door.  She awoke at 2:30 a.m. in her bed to find a man, later determined through DNA analysis to be Silva, grabbing her wrists and pinning her down.  While she tried to fight and scream, Silva told her to "[s]hut the fuck up or I'll take you out."  Silva began to tie Cynthia's leg to the bed but stopped when she told him she would not fight.  He had her get on her hands and knees, applied lubricant to her, raped and sodomized her, and then forced her to orally copulate him.  The room was dark and Cynthia complied with Silva's demand that she look away.  Cynthia told Silva not to harm her because she was an only child of an 88-year-old mother; in response Silva told her not to call her mother or the police or he would "take her out."  Silva tied Cynthia's wrists behind her back and told her to keep looking away; that he was going to clean himself.  He turned the light on, took a tissue from a drawer and went to the bathroom.  Cynthia eventually freed her wrists and

called the police.  Cynthia denied ever engaging in consensual sex with Silva or inviting him over to her house.

[¶] Police responding to Cynthia's call found a brown bootlace and a cap from a lubricant bottle.  A nurse who conducted a physical exam of Cynthia after the incident found injuries on her consistent with sexual assault as Cynthia described.

*Indecent Exposure - Counts 5 and 6*

[¶] On three separate occasions in July and August 2002, Diana Hatfield was walking in Silva's neighborhood when she passed his house and saw him either totally or partially unclothed and masturbating in his front yard.  During the second incident, Silva was close enough to make eye contact with Hatfield.  Hatfield reported the incidents to police.

[¶] In October 2002, Bonnie Thompson, a postal carrier for Silva's neighborhood, was delivering mail to Silva's residence when she saw him through the open front door, standing unclothed and masturbating in front of a mirror in his living room.  She saw him in the same condition a few weeks later; this time Silva looked at her through the reflection in his mirror.  At her supervisor's instruction, Thompson would not deliver mail if Silva's front door was open.  However, on two additional occasions Silva hid himself in his front patio so that Thompson would not see him until she entered to deliver the mail.  On those occasions, she found Silva seated in a chair with his pants down and his penis exposed.

*Offenses Against Amy L. - Counts 7 through 10*

[¶] At 3:00 a.m. on April 3, 2003, Amy L. went to sleep in her North Park apartment after going out with friends.  She had locked her windows and doors, but had lost her house keys the night before.  That morning she awoke to find a man sitting on top of her back, threatening to kill her if she didn't cooperate or crack her neck if she were to scream. The man grabbed her hands behind her back and tied them with what felt like tape.  He also placed tape over her mouth. The man pulled down her pants and underwear, lifted her up on her hands and knees, and raped and sodomized her.  He sat her on his lap and raped her again.  Eventually Amy freed her hands, removed the tape from her mouth and screamed. The man got very angry, slammed her head into the mattress and told her, "I should fucking kill you right now."  He then gagged her by putting something in her mouth, covered her head, and got dressed.  Amy never saw the man's face, but recalled his voice had a slight Hispanic accent.

[¶] Police later found red electrical tape and a used Band-aid in Amy's apartment, neither of which belonged to Amy. Two or three days later Amy also found an unfamiliar baseball cap on the floor of her bedroom, which she gave to

police.  Amy denied having ever seen Silva or having consensual sex with the person who entered her bedroom that morning.  The nurse who examined Amy after the incident found injuries consistent with Amy's description of the assault.

[¶] A criminalist who examined clothing and swabs taken from Amy L. submitted cuttings from the Band-aid, a comforter, cigarette butt, ball cap and one of a pair of stockings, as well as swabs from Amy's right hand and right and left breast, for DNA analysis.  A DNA profile taken from the Band-aid matched the DNA profile taken from Silva in Cynthia B.'s case.  Another criminalist could not exclude Silva as the contributor of the DNA on the ball cap found in Amy's room, but he concluded Silva was very likely the source of the predominant DNA profile obtained from the Band-aid.

*Defense Testimony*

[¶] Silva testified at trial about his involvement with Cynthia B.  According to Silva, he had several telephone conversations with Cynthia after leaving her a note asking whether she would be interested in going out with him.  He testified they talked on the telephone about their Memorial Day weekend plans on May 29, 2002, and again on May 30, 2002, during which [] she invited him over to her house to meet.  Later that evening, he entered her house and they had consensual intercourse.  Silva denied sodomizing her, threatening her or using tape or ropes.  He felt badly afterwards because he was still married, and told Cynthia so and that he could not have a relationship with her.  Silva testified Cynthia called him a couple more times afterwards asking if he wanted to have a relationship, but he declined.

(Lodgment No. 6 at 2-5.)

**III.  Procedural Background**

The San Diego County District Attorney's Office filed an Information charging Petitioner with three counts of forcible rape (counts 1, 7, 8) in violation of California Penal Code ("Penal Code") section 261(a)(2); two counts of forcible sodomy (counts 2, 9) in violation of Penal Code section 286(c)(2); one count forcible of oral copulation (count 3) in violation of Penal Code section 288a(c)(2); two counts of residential burglary (counts 4, 10) in violation of Penal Code section 459; and two counts of misdemeanor indecent exposure (counts 5, 6) in

4

violation of Penal Code section 314.1.  (CT at 15-20.)  The
Information alleged special allegations as to all felony counts.
(CT at 15-16.)  A jury found Petitioner guilty of all counts and
found true all special allegations.  (CT at 270-86; Lodgment No.
2, Reporter's Transcript ("RT"), at 534-40.)[1]  The trial court
sentenced Petitioner to a 25-years-to-life term on counts 1-4, a
25-years-to-life term on counts 7-10, plus a 32-year term.  (CT
at 241-44.)  Petitioner filed a Motion for New Trial, (CT at 214-
24), which the trial denied after holding a hearing.  (RT 546-
66.)

     On April 4, 2005, Petitioner filed a direct appeal
challenging his conviction and sentence in the California Court
of Appeal, Fourth Appellate District, Division One.  (Lodgment
Nos. 3-5.)  On January 12, 2006, the California Court of Appeal
affirmed Petitioner's conviction and sentence in an unpublished
opinion.  (Lodgment No. 6.)  On January 18, 2006, Petitioner
filed a Petition for Review in the California Supreme Court,
(Lodgment No. 7), which the court denied without comment.
(Lodgment No. 8.)

     Petitioner filed a Petition for habeas corpus relief
pursuant to 28 U.S.C. § 2254 in this Court on March 22, 2007.
[Doc. No. 1.]  Petitioner filed a First Amended Petition on May
24, 2007.  [Doc. No. 4.]  Respondent filed an Answer on August 6,

---

     [1] Volume 6 of Lodgment No. 2, Reporter's Transcript, begins with
consecutively numbered pages starting with page 546.  However,
beginning with page 549, all pages within Volume 6 are hand-marked and
consecutively numbered 549/1 through 549/128.  Volume 7 begins with
page 550 and contains consecutively numbered pages thereafter.

1   2007.  [Doc. No. 8.]²

2   **IV.   Discussion**

3        **A. Standard of review**

4        Title 28, United States Code, § 2254(a), sets forth the

5   following scope of review for federal habeas corpus claims:

6            The Supreme Court, a Justice thereof, a circuit
         judge, or a district court shall entertain an
7        application for a writ of habeas corpus in behalf of a
         person in custody pursuant to the judgment of a State
8        court only on the ground that he is in custody in
         <u>violation of the Constitution or laws or treaties of</u>
9        <u>the United States.</u>

10  28 U.S.C. § 2254(a) (emphasis added).

11       The current Petition is governed by the Anti-Terrorism and

12  Effective Death Penalty Act of 1996 ("AEDPA").  <u>See</u> <u>Lindh v.</u>

13  <u>Murphy</u>, 521 U.S. 320 (1997).   As amended, 28 U.S.C. § 2254(d)

14  reads:

15           (d) An application for a writ of habeas corpus on
         behalf of a person in custody pursuant to the judgment
16       of a State court shall not be granted with respect to
         any claim that was <u>adjudicated on the merits</u> in State
17       court proceedings unless the adjudication of the claim-

18           (1) resulted in a decision that was contrary
19       to, or involved an unreasonable application
         of, clearly established Federal law, as
20       determined by the Supreme Court of the United
         States; or
21
             (2) resulted in a decision that was based on
22       an unreasonable determination of the facts in
         light of the evidence presented in the State
23       court proceeding.

24  28 U.S.C. § 2254(d)(1)-(2) (emphasis added).

25  ///

26

27       ² Petitioner did not file a Traverse to Respondent's Answer.
28  Because Petitioner did not file a Traverse, the allegations of the
    Answer "shall be accepted as true except to the extent that the judge
    finds from the evidence that they are not true."  28 U.S.C. § 2248.

To obtain federal habeas relief, Petitioner must satisfy either § 2254(d)(1) or § 2254(d)(2).  See Williams v. Taylor, 529 U.S. 362, 403 (2000).  The Supreme Court interprets § 2254(d)(1) & (2) as follows:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

Id. at 412-13; see also Lockyer v. Andrade, 538 U.S. 63, 73-74 (2003).

Where there is no reasoned decision from the state's highest court, this Court "looks through" to the underlying appellate court decision.  Ylst v. Nunnemaker, 501 U.S. 797, 801-06 (1991). If the dispositive state court order does not "furnish a basis for its reasoning," federal habeas courts must conduct an independent review of the record to determine whether the state court's decision is contrary to, or an unreasonable application of, clearly established Supreme Court law.  See Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000) (overruled on other grounds by Lockyer v. Andrade, 538 U.S. 63, 75-76); accord Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  However, a state court need not cite Supreme Court precedent when resolving claims presented on direct or collateral review.  Early v. Packer, 537 U.S. 3, 8 (2002).  "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]," id., the state court decision will not be "contrary

07cv0537

1  to" clearly established federal law.   _Id._

2     **B.   Denial of Severance**

3     In his first claim, Petitioner contends that the trial court

4  committed reversible error by refusing to sever the Cynthia B.

5  counts from the Amy L. counts, rendering his trial fundamentally

6  unfair.  (Petition, Ground One.)  Petitioner contends that the

7  joinder of the Cynthia B. counts with the Amy L. counts

8  prejudiced his trial on the Cynthia B. counts, to which he had a

9  consensual-sex defense.  (_Id._)  Respondent contends that the

10  evidence would have been cross-admissible in separate trials, and

11  thus Petitioner cannot show that he was actually prejudiced when

12  the trial court refused to sever the counts.  (Answer at 8-9.)

13     Petitioner first raised this claim prior to trial in a

14  motion for severance of counts based on the theory that the

15  assaults and indecent exposure took place on separate occasions

16  and involved separate victims. (CT at 21-45; RT at 16-38.)

17  Petitioner requested three (if not four) separate trials.  (CT at

18  45; RT at 15.)  After a lengthy hearing with extensive argument

19  from both the prosecution and defense, the trial court denied the

20  motion.  (RT 16-38; CT at 259.)

21     In denying the motion for severance of counts, the trial

22  court found that the statutory requirements for joinder were met

23  because the evidence in both the Cynthia B. and Amy L. counts was

24  cross-admissible.  (RT at 37.)  The trial court noted, however,

25  that there was a "substantial danger of undue prejudice" caused

26  by joinder of the claims in the case.[3]  (_Id._)  To alleviate that

27  _____

28     [3] If Petitioner testified in defense of the Cynthia B. counts, he
would be subject to cross-examination on the Amy L. counts.  (RT at
19.)  This would have been problematic for Petitioner.  Petitioner
told trial counsel that he met Amy L. the night before she was raped

07cv0537

danger, the trial court exercised its "residual" power under
California Evidence Code section 352 and ruled that Petitioner
could testify in defense of the Cynthia B. charges without
subjecting himself to cross-examination on the Amy L. charges.
(RT at 37-38.)  In exercising this discretion, the trial court
asserted that it had sufficiently addressed the risk of undue
prejudice and the potential denial of the right to a fair trial.
(RT at 38.)

     Petitioner raised this claim on direct appeal.  (Lodgment
Nos. 3-5.)  The California Court of Appeal affirmed the judgment
in an unpublished opinion.  (Lodgment No. 6.)  The California
Supreme Court denied a subsequent petition for review without
comment.  (Lodgment Nos. 7-8.)  Because the California Supreme
Court did not "furnish a basis for its reasoning," this Court
must look through to the reasoning of the underlying decision of
the California Court of Appeal.  See Ylst, supra, 501 U.S. at
801-06.  (Lodgment No. 6.)

     Under clearly established U.S. Supreme Court law, improper
joinder of *defendants* violates the Constitution only when it
results in prejudice so great that it denies a defendant his
Fifth Amendment right to a fair trial.  United States v. Lane,
474 U.S. 438, 446 n.8 (1986) (emphasis added).  However, the U.S.

---

while she was in a drunken stupor.  (RT at 549/88, 559.)  Amy L. got
into Petitioner's van to look for her car.  (RT at 549/88, 559-60.)
Amy L. testified at the preliminary hearing that the man driving her
told her he was going to rape her.  (RT at 560.)  Amy L. escaped,
leaving behind her keys to her apartment, her bag, and her
identification.  (RT at 560, 576.)  Amy L. immediately called 911 and
reported the attempted rape.  (RT at 549/89-90.)  If Petitioner was
questioned at trial regarding the Amy L. counts, he could be
prejudiced by either his refusal to respond or his evasive answers.
(RT at 19-20.)

1   Supreme Court has not clearly addressed whether improper joinder

2   of *counts* implicates federal constitutional issues.  Therefore,

3   because there is no clearly established U.S. Supreme Court law

4   pertaining to improper joinder of *counts*, Petitioner's claim is

5   not subject to federal habeas relief under 28 U.S.C.

6   § 2254(d)(1).  Even if Petitioner had raised a claim for which

7   federal habeas relief was available, however, Petitioner's claim

8   is without merit.

9        The Ninth Circuit has summarized the test for assessing when

10  consolidation of counts rises to the level of a due process

11  violation:

12        [T]he propriety of a consolidation rests within the
          sound discretion of the state trial judge.  The
13        simultaneous trial of more than one offense must
          actually render petitioner's state trial fundamentally
14        unfair and hence, violative of due process before
          relief pursuant to 28 U.S.C. § 2254 would be
15        appropriate.

16  Bean v. Calderon, 163 F.3d 1073, 1084 (9th Cir. 1998) (quoting

17  Featherstone v. Estelle, 948 F.2d 1497, 1503 (9th Cir. 1991)).

18  Additionally, even if the trial court's denial of the motion for

19  severance violated Petitioner's due process rights, habeas relief

20  would not be available in this Court unless the error had a

21  "substantial and injurious effect or influence in determining the

22  jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619 at 637

23  (1993); see also California v. Roy, 519 U.S. 2, 5 (1996).

24       The California Court of Appeal denied this claim, stating:

25        [¶] Silva contends the trial court prejudicially abused its
          discretion by denying his motion to sever the charges
26        relating to Cynthia B. from the remaining indecent exposure
          and Amy L. counts.  Although he concedes joinder of the
27        offenses is admissible [sic] under section 954 because they
          belong to the same assaultive class and that the court
28        permitted him to testify on the Cynthia B. counts without
          being subject to cross-examination on the other counts, he

07cv0537

nevertheless maintains the trial court's refusal to separate
the counts resulted in a "grossly unfair trial" in violation
of the California Constitution and the Fifth and Fourteenth
Amendments.  Specifically, he argues the counts as to
Cynthia B. and Amy L. were mutually irrelevant to each other
and even if properly joined under section 954, the Amy L.
counts, to which he presented no defense due to asserted
ineffective assistance of counsel (a claim we reject below),
had a highly inflammatory "spillover" effect that tainted
his trial on the Cynthia B. counts to which he had a
defense.  Silva also challenges the commonality of the rape
and sodomy offenses against Cynthia B. and Amy L., asserting
they do not establish either intent or identity sufficient
to permit cross-admissibility under section 1101,
subdivision (b).

. . .

[¶] Because, Silva concedes, the offenses were of the same
class, joinder of the counts under section 954 was
appropriate unless Silva could make "a clear showing of
potential prejudice" due to the consolidation of such
properly joined counts.  (citation omitted.)  Silva did not
meet this burden.  "'"The determination of prejudice is
necessarily dependent on the particular circumstances of
each individual case, but certain criteria have emerged to
provide guidance in ruling upon and reviewing a motion to
sever trial." (citation omitted.)  Refusal to sever may be
an abuse of discretion where: (1) evidence [of] the crimes
to be jointly tried would not be cross-admissible in
separate trials; (2) certain of the charges are unusually
likely to inflame the jury against the defendant; (3) a
"weak" case has been joined with a "strong" case, or with
another "weak" case, so that the "spillover" effect of
aggregate evidence on several charges might well alter the
outcome of some or all of the charges; and (4) any one of
the charges carries the death penalty or joinder of them
turns the matter into a capital case.'" (citation omitted.)

. . .

[¶] Here the trial court found the charges against Cynthia
B. and Amy L., as well as the indecent exposure charges,
would be cross-admissible under Evidence Code section 1108.
Evidence Code section 1108 provides that where a defendant
is accused of a sexual offense in a criminal action,
"evidence of the defendant's commission of another sexual
offense or offenses is not made inadmissible by [Evidence
Code] [s]ection 352." (footnote omitted.) Rape, forcible
sodomy and forcible oral copulation under Penal Code
sections 261, subd. (a)(2), 286, subd. (c)(2), and indecent
exposure under Penal Code section 314 are "sexual offenses"
as defined in Evidence Code section 1108. (citation
omitted.)  Evidence of Silva's crimes against Amy L. was
therefore admissible on the other charges, unless it was
insufficiently probative or unduly prejudicial under

11

07cv0537

Evidence Code section 352.

[¶] Undertaking that Evidence Code section 352 analysis, the trial court determined the probative value of the evidence of the Amy L. charges and the indecent exposure charges was not outweighed by any probability of confusion or undue time consumption, and it rejected any claim of prejudice.  This ruling was not an abuse of discretion.  The charges with respect to both Cynthia B. and Amy L. were almost identical (Amy L. was the subject of an additional forced oral copulation charge), and Silva's actual conduct during the offense was very similar.  In both cases, he entered the victims' homes in the early morning hours while they slept; he attempted to bind or actually bound them; he used threats against each victim to deter their screams; and he placed them in a similar position (on hands and knees) in which to both rape and sodomize them.  The fact the crimes against Amy L. and Cynthia B. took place approximately one year apart did not affect the probative value of the offenses. Cases decided under Evidence Code section 1108 have approved the admission of much older evidence of prior sexual offenses.  (citation omitted.)  Under the circumstances, cross-admissibility of the evidence on the charges against Silva sufficed to negate any prejudice, and eliminated the need to analyze the other factors mentioned above. [citation.]

[¶] Even assuming the trial court erred in its ruling on cross-admissibility, the potential prejudice Silva asserts would result from joinder "[does] not rise to the level of demonstrating that the court's denial of severance was an abuse of discretion." (citation omitted.)  In particular, we disagree with Silva's argument that the Amy L. counts had any inflammatory spillover effect due to the relative strength and weakness of the cases.  Both cases were supported by compelling independent evidence consisting of the victims' own testimony and physical examinations, as well as DNA evidence identifying Silva as the likely contributor.  There is absolutely no showing that the jury in any way used evidence from one of the cases to bolster the other. (citation omitted.)  Under these facts, Silva in our view cannot show a substantial danger of prejudice.  The court correctly addressed the motion for severance on the record before it by Silva, and we find no abuse of discretion in its ruling. (citation omitted.)

[¶] Nor has Silva shown that the trial court's decision to join the offenses, though correct when made, actually resulted in gross unfairness amounting to a denial of due process.  (citation omitted.)  Silva appears to argue that, but for his counsel's ineffective assistance, he would have had an alibi defense to the Amy L. charges that would have lessened the prejudice caused by joinder.  We reject Silva's claim of ineffective assistance below.  However the jury disbelieved Silva's defense to the Cynthia B. charges, and

1    we see no reason why the jury would have believed any alibi
     defense presented by him as to Amy L., particularly in view
2    of the DNA evidence linking him to the crimes.  No gross
     unfairness resulted from joinder to deprive him of a fair
3    trial or due process of law.

4  (Lodgment No. 6 at 5-11.)

5      **(1) The state appellate court's decision was not contrary to
       or an unreasonable application of clearly established
6      federal law.**

7      The state appellate court's decision here is not "contrary

8  to" clearly established federal law because it neither "applies a

9  rule that contradicts the governing law set forth in [United

10  States Supreme Court] cases" nor "confronts a set of facts that

11  are materially indistinguishable from a decision of [the Supreme

12  Court] and nevertheless arrives at a result different from [the

13  Supreme Court's] precedent."  <u>Williams</u>, <u>supra</u>, 529 U.S. at 405-

14  06.  The test applied by the state appellate court does not

15  "contradict" clearly established federal law because federal law

16  recognizes the need for consideration of substantially similar

17  factors as were identified by the state court.

18      The test applied to analyze the potential prejudice from

19  joining counts by the state included factors such as: (1) lack of

20  cross-admissibility of evidence; (2) whether the nature of the

21  charges was unusually likely to inflame the jury; or (3) the

22  presence of any "spillover" effect of evidence from a strong

23  charge to a weak one which might affect the outcome.  (Lodgment

24  No. 6 at 6, 8.)  Similarly, the factors applied under federal law

25  when undertaking the same analysis include: (1) considering

26  whether the defendant would likely become embarrassed or

27  confounded in presenting separate defenses; (2) whether the jury

28  would likely use the evidence of one crime to infer a criminal

13

07cv0537

disposition for commission the other crime; or (3) whether the jury would likely fail to compartmentalize the crimes charged and find guilt where, had the crimes been considered separately, it would not so find. <u>See</u> <u>Bean</u>, <u>supra</u>, 163 F.3d at 1084-86; <u>see also</u> <u>Drew v. United States</u>, 331 F.2d 85, 88 (D.C. Cir. 1964). Thus, the state law applied by the California Court of Appeal in determining whether the trial court abused its discretion in joining the counts is compatible with the "fundamental fairness" inquiry under federal law.

Neither did the California Court of Appeal's decision involve an unreasonable application of federal law.  In his federal Petition, Petitioner challenges the trial court's decision to deny the motion for severance vis-a-vis the third factor in the state court's analysis and the second factor in the federal court's analysis, that is, whether a "spill-over" effect occurred because the court did not sever the counts in Petitioner's trial. (<u>See</u> Petition, Ground One.)  The thrust of Petitioner's argument is that the prosecution improperly combined the evidence in the two cases because the evidence in the Amy L. case was strong, while the evidence in the Cynthia B. case was weak.  Prosecuting the counts together, Petitioner contends, had a "cumulative effect" on the jury, which used the evidence of the sexual assault on Amy L. to infer a criminal predisposition for commission of the crimes against Cynthia B. (Petition, Ground One; <u>see</u> RT at 20, 25.)  Therefore, Petitioner contends, the jury believed that he raped Cynthia B. even though the sex was consensual.  Along the same lines, Petitioner contends that by restricting Petitioner in defending against the Amy L. counts, to

1  which he had an alleged alibi defense, his decision not to

2  testify led the jury to believe that he must be guilty of the Amy

3  L. counts.  (Lodgment No. 3 at 26; RT 15-38.)

4      Under Ninth Circuit case law, joinder may be considered

5  unconstitutional under circumstances in which the prosecution

6  joins a strong evidentiary case with a weaker case, hoping that

7  the overlapping evidence will lead to a conviction in both.

8  <u>Bean</u>, <u>supra</u>, 163 F.3d at 1083.  Here, the District Attorney

9  initially rejected prosecuting Petitioner for the Cynthia B.

10 assault because Cynthia B.'s and Petitioner's stories were too

11 divergent.[4]  (CT at 24, Motion for Severance of Counts.)  At the

12 _____

13     [4] Cynthia B. and Petitioner gave differing testimony as to their
    "relationship" prior to the assault.  Cynthia B. testified that around
14  February or March 2002, she found a note on her lawn that said, "I
    think you're a beautiful woman." (RT at 89.)  The note contained a
15  phone number.  (RT at 90.)  Cynthia B. was flattered by the note and
    called the number.  (RT at 93.)  She had several conversations over
16  the phone with a person named "Lee." (RT at 90, 104.)  Cynthia B.
    testified that she never met up with the person she talked to on
17  the phone.  (RT at 90.)  During the rape investigation, Cynthia B.
    told police about the note.  (RT at 91.)  Cynthia B. suspected Lee was
18  her assailant because of prior conversations they had.  (RT at 106.)
    With the police listening in, Cynthia B. called the number again.  (RT
19  at 91.)  Cynthia B. asked the man where he lived and his last name.
    (RT at 94, 104.)  The man told her his last name was Silva and that he
20  lived on Market Street.  (RT at 109, 300, 309-10.)  Cynthia B. also
    learned the man's name was Leslie, not "Lee." (RT at 104.)
21  Petitioner's birth name is Leslie, but he goes by "Lee." (RT at 279.)
    Cynthia B. looked up Leslie Silva's exact address in the phone book
22  and drove by his residence several times.  (RT at 107.)  Cynthia B.
    wanted to see what her assailant looked like.  (RT at 107.)  The
23  police, after naming Leslie Silva as a suspect, interviewed him and
    asked to take a mouth swab.  (RT at 301.)  The DNA obtained from the
24  crime scene matched the DNA from the mouth swab.  (RT at 228.)
        Petitioner testified that he wrote a note to Cynthia B. telling
25  her she was pretty and asking her if she would like to go out with
    him.  (RT at 265.)  Petitioner said they talked several times on the
26  phone about a month before the alleged rape and made plans to meet up.
    (RT at 266-67.)  They never did.  (RT at 267.)  On the night of the
27  alleged rape, Petitioner testified that he called Cynthia B. and made
    plans to get together.  (RT at 267-68.)  He went to her house and
28  after talking with her for about one to two minutes, they had
    consensual sex.  (RT at 269-70, 292.)  Afterwards, Petitioner

1   time, it was difficult for the District Attorney to prove that

2   Cynthia B. did not have consensual sex with Petitioner because of

3   several conversations that took place between the parties before

4   the rape. (Id. at 24-25.)  However, after the Amy L. assault, the

5   police were able to enter a DNA profile obtained from a Band-aid

6   left in her apartment into a local DNA database.  (RT at 252.)

7   In entering the profile, results came back that the same DNA

8   profile had been entered into the database on a previous

9   occasion, after the Cynthia B. assault.  (RT at 252.)  The DNA

10  profile matched Petitioner.  (RT at 253.)

11       Due to the similarity of the crimes, the matching DNA

12  profiles, the strong independent evidence, and the cross-

13  admissibility of the evidence, the District Attorney was ready to

14  prosecute both cases, either jointly or separately.  (RT at 3,

15  28.)  If the court granted the motion for severance, the District

16  Attorney planned to prosecute the Amy L. charges first and the

17  Cynthia B. charges second.  (RT at 3.)  This was not a case in

18  which, if the court denied the motion for severance, the District

19  Attorney would not have prosecuted the "weaker" case.  Rather,

20  both cases were supported by strong independent evidence.

21       In the Cynthia B. assault, Petitioner had seen the victim

22  before the assault from his nearby cousin's house.  (RT at 277,

23  312.)  Cynthia B. testified that Petitioner entered Cynthia B.'s

24  house in the early morning.  (RT at 74.)  Petitioner told her

25  that if she screamed he would "take her out."  (RT at 75.)

26  _____

27  testified that he felt bad about having sex with Cynthia B. because he
    was still married and told Cynthia B. he did not want to have a
    relationship with her.  (RT at 272.)  Petitioner contends Cynthia B.
28  called him several times afterwards asking if he would have a
    relationship with her.  (RT at 273, 286.)  Petitioner told Cynthia B.
    he would not.  (RT at 273.)

16

1  Petitioner forced Cynthia B. to get on her knees with her face in
2  the pillow.  (RT at 76-77.)  Petitioner forced Cynthia B. to first
3  have vaginal intercourse with him.  (Id.)  Petitioner then forced
4  Cynthia B. to have anal intercourse with him.  (RT at 77-78.)
5  Lastly, Petitioner forced her to orally copulate him.  (RT at
6  79.)  Petitioner then tied the victim's hands behind her back.
7  (RT at 80.)  They were tied in such a way that the victim could
8  eventually free herself.  (RT at 103.)  The entire episode lasted
9  roughly 25 minutes.  (RT at 83.)  DNA analysis of a spine swab
10 from Cynthia B.'s back revealed Petitioner's DNA.  (RT at 228.)

11      The facts in the Amy L. assault are strikingly similar to
12 the facts in the Cynthia B. assault.  In the Amy L. assault,
13 Petitioner had seen Amy L. the night before the assault.  (RT at
14 559-60.)  Amy L. testified that Petitioner entered Amy L.'s house
15 in the early morning.  (RT at 142-43.)  Petitioner told her that
16 if she did not cooperate, he would kill her or crack her neck.
17 (RT at 143.)  Petitioner tied the victim's hands behind her back.
18 (Id.)  They were tied in such a way that the victim could
19 eventually free herself.  (RT at 150.)  Petitioner placed Amy L.
20 on her knees.  (RT at 145.)  Petitioner forced Amy L. to first
21 have vaginal intercourse with him.  (Id.)  Petitioner then forced
22 her to have anal intercourse with him.  (Id.)  The entire episode
23 lasted roughly 20 minutes.  (RT at 154.) DNA analysis of a Band-
24 aid left in Amy L.'s house revealed Petitioner's DNA.  (CT at
25 227; RT at 560.)

26      Nurse Clair Nellie specializes in sexual assault crimes and
27 conducted rape examinations on both Cynthia B. and Amy L.  (RT at
28 169, 171, 182.)  During the examination of Cynthia B., Nellie

07cv0537

observed injuries consistent with both vaginal and anal sexual
assault.  (RT at 176-78.)  Additionally, Nellie took a swab of
Cynthia B.'s spine because Cynthia B. told her the assailant
licked her spine.  (RT at 179.)  Nellie also found red
indentations on Cynthia B.'s wrists consistent with Cynthia B.'s
story that the assailant tied her wrists and attempted to tie her
legs.  (RT at 173-74.)  Nellie's testimony corroborated Cynthia
B.'s testimony, not Petitioner's.[5]  (RT at 182.)

      Nellie also observed injuries consistent with sexual assault
on Amy L.  (RT at 186.)  During an anal examination, Nellie
observed redness and bruising in Amy L.'s anal canal.  (RT at
187.)  At the back of her anal canal, there were several
lacerations with active bleeding.  (Id.)  Nellie also observed an
injury to Amy L.'s lip, which was swollen and bruised, as well as
bruises on her legs and shins.  (RT at 184.)  Nellie's testimony
corroborated Amy L.'s testimony that she was raped.  (RT at 189.)

      Both cases were supported by strong, independent, cross-
admissible, evidence.  (RT at 28.)  Both Cynthia B. and Amy L.
testified at trial. (RT at 72-111, 140-66.)  The cases were
markedly similar, adding to the strength of the testimony.
Petitioner had seen both victims before the rape, he entered
their homes in the early morning, he tied or attempted to tie

---

[5] Despite Petitioner's testimony that the sex was consensual,
Cynthia B.'s actions after the incident did not indicate consensual
sex.  Cynthia B. immediately called 911 after the assault.  (RT at 82,
359.)  She underwent a two to three hour rape examination conducted at
4:15 a.m.  (RT at 171-74, 359.)  Moreover, Cynthia B. could not
recognize Petitioner at trial and could not identify her assailant.
(RT at 88, 108.)  The District Attorney argued that if Cynthia B. was
upset because Petitioner refused to have a relationship with her and
wanted to punish him by reporting a false rape, she would not have
undergone the invasive rape evaluation, nor would she have had
difficulty identifying him at trial.  (RT at 388.)

18

1   them up, he threatened to kill them, he placed them in similar

2   sexual positions, he had both vaginal and anal sex with them, and

3   the rapes lasted around 20-25 minutes.  Additionally, the

4   investigation revealed Petitioner's DNA at the crime scenes in

5   both cases and the testimony of nurse Clair Nellie corroborated

6   the victims' testimony.  (RT at 169-94.)  Furthermore, the jury

7   had the opportunity to evaluate the credibility of the witnesses,

8   including Petitioner.  (RT at 338-40.)  Ultimately, the jury

9   found the testimony of the victims and the nurse more credible.

10          Even if the evidence of the Cynthia B. and the Amy L.

11   assaults was not properly cross-admissible, the jury received

12   ample instruction on compartmentalizing the counts throughout

13   trial, thus reducing the effect of a "spillover."  When

14   instructing the jury *before* trial on the alleged crimes, the

15   trial court specifically told the jury that Petitioner was

16   charged with "a *separate* commission of the crime of rape on Amy."

17   (RT at 63 (emphasis added).)  After both sides rested, the court

18   again admonished the jury they were to "reach a *separate* decision

19   concerning each of the *separate* charges and the accompanying

20   allegations."  (RT at 322 (emphasis added).)  The court went on

21   to explain,

22          Each of the counts alleges a *separate* and distinct crime.
            *Separate* and distinct in terms of its commission and the
23          alleged victim.  The crimes may be the same, but each
            alleges a *separate* victim.  So you must consider each count
24          *separately*... So you'll be asked to *separately* decide as to
            each *separate* charge or allegation.
25

26   (RT at 352 (emphasis added).)  Using CALJIC 17.02, the trial

27   court instructed the jury as follows:

28          Each Count charges a *distinct* crime.  You must decide each
            Count *separately*.  The defendant may be found guilty or not

                                        19

guilty of any or all of the crimes charged.  Your finding as
to each Count must be stated in a *separate* verdict.

(CT at 166 (emphasis added).)  Petitioner has failed to present
any evidence that the jury was unable to follow these
instructions, and the record supports a finding that the jury was
able to decide each count separately.

Lastly, any contention by Petitioner that the court
restricted him in defending against the alleged assault on Amy
L., and that such a restriction led the jury to believe it was
more likely that he committed the assault on her, is meritless.
The trial court allowed Petitioner to testify to the encounter
with Cynthia B. without being subjected to cross-examination on
the Amy L. counts.  (RT at 328.)  The trial court did not
restrict Petitioner in his defense against the Amy L. assault;
rather, he chose not to testify.  Had Petitioner testified to his
alleged alibi for the crimes against Amy L., the 911 tape in
which Amy L. screamed hysterically about an attempted rape the
night before would most certainly have been admitted on cross-
examination and been seriously detrimental to Petitioner's
defense.  (See Lodgment No. 6 at 16.)  It appears that Petitioner
wanted a trial in which he could testify to his alleged alibi
regarding the Amy L. assault, without being subjected to cross-
examination.  This is a patently unrealistic and untenable
position.  See Ford v. Wainwright, 477 U.S. 399, 415 (1986)
(noting the necessity and importance of cross-examination for the
discovery of truth).

Moreover, the trial court instructed the jury regarding
Petitioner's election not to testify in response to the Amy L.

07cv0537

charges.  Using CALJIC 2.61, the trial court instructed the jury as follows:

> In deciding whether or not to testify, the defendant may choose to rely on the state of the evidence and upon failure, if any, of the People to prove beyond a reasonable doubt every essential element of the charge against him.  No lack of testimony on defendant's part will make up for a failure of proof by the People so as to support a finding against him on any such essential element.

(CT at 145; RT at 328, 343.)  Thus, the court properly instructed the jury regarding Petitioner's decision to exercise his right not to testify in defending against the Amy L. charges.

**(2) The state court's decision was not an unreasonable determination of the facts in light of the evidence presented.**

Because the California Court of Appeal's decision was not contrary to, or an unreasonable application of, federal law, the only remaining issue is whether the California Court of Appeal made an unreasonable determination of the facts in denying Petitioner's motion for severance.  Taking into account the review of the record conducted in the prior section (with respect to whether there was an unreasonable application of federal law), the evidence presented supports the court's decision.  There is no indication that the California Court of Appeal made an unreasonable determination of the facts.

Ultimately, Petitioner failed to carry his burden of demonstrating that the state court's denial of his motion for severance rendered his trial fundamentally unfair.  Petitioner has failed to show that the state court's adjudication of Petitioner's claim resulted in a decision that was contrary to, or involved an unreasonable application of clearly established federal law, or that it was based on an unreasonable

determination of the facts in light of the evidence presented in the state court proceedings.  See 28 U.S.C. § 2254(d)(1)-(2).

Moreover, even assuming Petitioner could satisfy the conditions of § 2254(d)(1) or (2) by demonstrating that the trial court's denial of the motion for severance violated due process, the Court finds that any such error by the state court did not have a "substantial and injurious effect or influence in determining the jury's verdict."  Brecht, supra, 507 U.S. at 637. Accordingly, this claim should be denied.

### C.  **Ineffective Assistance of Counsel**

In his second claim, Petitioner contends that his trial counsel, John Blakely, was constitutionally ineffective in five respects: (1) Mr. Blakely failed to consult with Petitioner about trial strategy; (2) he failed to disclose a taped conversation with Cynthia B.; (3) he failed to hire an investigator; (4) he failed to present Petitioner's alibi defense to the Amy L. charges (including failure to cross-examine Amy L. on drug usage with Petitioner the night before the assault); and (5) he failed to present character witnesses on Petitioner's behalf. (Petition, Ground Two.)

Under clearly established U.S. Supreme Court law, to establish ineffective assistance of counsel, Petitioner *must show*: (1) "counsel's representation fell below an objective standard of reasonableness" and (2) there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  Strickland v. Washington, 466 U.S. 668, 687, 688, 690, 692, 694 (1984) (emphasis added). Petitioner's claim fails if he makes an insufficient showing on

1  either one of these components.  <u>Id.</u> at 687.  Additionally, mere
2  conclusory allegations that are not supported by specific facts
3  do not merit habeas relief.  <u>James v. Borg</u>, 24 F.3d 20, 26 (9th
4  Cir. 1994), <u>cert.</u> <u>denied</u>, 513 U.S. 935 (1994); <u>O'Bremski v.</u>
5  <u>Maass</u>, 915 F.2d 418, 420 (9th Cir. 1990) (the petitioner must
6  state facts which point to a real possibility of constitutional
7  error).

8      Additionally, a wide measure of deference must be given to
9  counsel's tactical decisions.  Indeed, <u>Strickland</u> notes that
10  "counsel's tactical decisions are virtually unchallengeable."
11  <u>Id.</u> at 690; <u>see</u> <u>also</u>, <u>Furman v. Wood</u>, 190 F.3d 1002, 1007 (9th
12  Cir. 1999).  A petitioner "must overcome the presumption that,
13  under the circumstances, the challenged action 'might be
14  considered sound trial strategy.'"  <u>Strickland</u>, <u>supra</u>, 466 U.S.
15  at 689 (citations omitted).

16      Petitioner first raised this claim on direct appeal before
17  the California Court of Appeal, which affirmed the judgment of
18  the state trial court in an unpublished written opinion.
19  (Lodgment No. 6.)  The California Supreme Court denied review
20  without comment.  (Lodgment No. 8.)  Thus, this Court must "look
21  through" to the decision of the California Court of Appeal as the
22  basis for its analysis.  <u>See</u> <u>Ylst</u>, <u>supra</u>, 501 U.S. at 801-06.
23  The California Court of Appeal denied this claim, stating:

24      [¶] ... For Silva to make a meritorious claim of
         constitutionally ineffective assistance of counsel, he must
25      establish both: "'(1) that counsel's representation fell
         below an objective standard of reasonableness; and (2) that
26      there is a reasonable probability that, but for counsel's
         unprofessional errors, a determination more favorable to
27      defendant would have resulted.'" (citation omitted.)...

28      . . .

23

07cv0537

[¶] In his new trial motion, Silva argued Blakely did not maintain adequate communication with him; that Blakely only contacted him once before the preliminary hearing, did not visit him in jail to discuss the case, and, though Silva gave him a list of potential alibi witnesses, Blakely never told Silva he had contacted or spoken with those persons and they were not called at trial. Silva also contended Blakely neglected to hire a private investigator or utilize an in-house investigator to contact and [obtain] statements from his mother, Emily Silva, or wife, Cara Silva, who according to Silva could account for his whereabouts on April 3, 2002. Silva claimed they were never interviewed and points out they were not called as witnesses at trial. At the hearing on his new trial motion, Silva also testified Blakely did not do any investigation into another possible witness, Jennifer Carter, who according to Silva had seen Cynthia B. driving by Silva's house on numerous occasions.

[¶] In his brief on appeal, Silva sets out all the testimony at the hearing on his new trial motion (his own testimony, that of his mother, wife, and Blakely's testimony) and he cites authority for general propositions relating to ineffective assistance claims, but he does not develop meaningful legal arguments as to why Blakely was assertedly deficient in his communications with Silva about trial strategy and the case in general, or apply any of the decisional authority to the present circumstances. Silva's main argument is that Blakely was derelict in not investigating and presenting Silva's alibi defense to the charges against Amy L., namely, that Silva was at home on the morning in question putting out a fire. Indeed Silva's sole argument as to prejudice is that Blakely's rejection "out of hand" of the potential alibi defense as to the Amy L. charges requires per se reversal and also reversal under the harmless error standard of *Chapman v. California* (1967) 386 U.S. 18; he maintains had that defense been presented to the jury he stood a reasonable chance of obtaining a more favorable verdict.

[¶] The court's ruling on the new trial motion, however, expressly turned on its credibility assessments of Silva, his mother and wife on the one hand, and Blakely on the other, to resolve, as Silva's counsel put it, "diametrically opposed positions." At the hearing on Silva's new trial motion, Blakely testified that he and Silva discussed the potential for using his mother and wife as alibi witnesses well before trial. Further, Blakely testified he spoke with Emily Silva more than once about her proposed alibi testimony. She told him she was asleep in the house and awakened at some point because there was a fire in the kitchen, but she had no idea where Silva was. She was unable to tell Blakely how she became aware the kitchen fire occurred on the same day as Amy L.'s alleged rape. According to Blakely, he interviewed Cara Silva five to six times in face-to-face meetings; he found Cara Silva to be a

worthless witness and told Silva so; among other things Cara
Silva was homeless, severely addicted to methamphetamine,
and in his view was obviously fabricating much of what she
said.  Blakely believed no rational person would put her on
the stand as a witness.  As for the merits of the alibi
defense, Blakely decided based on the distance between the
homes that a reasonable jury could conclude Silva could have
been in both places, that is, travel from Amy L.'s apartment
to his residence in time to put out the fire.

[¶] Presenting an alibi defense in the Amy L. case also
proved tactically troubling to Blakely.  Blakely testified
that Silva told him he had not been at Amy L.'s house on the
morning in question.  However, Silva said he met her the
night before when she was in a drunken stupor, that she got
in his vehicle to look for her car, and they stopped and did
a line of methamphetamine.  Blakely was in possession of a
911 tape from that evening of Amy L., screaming and
hysterical, calling about an attempted rape.  Blakely told
Silva that his testimony on the Amy L. alibi defense would
expose the 911 tape and subject Silva to certain conviction
for her rape the next morning.  Blakely's legal strategy was
to move to sever the charges, which he discussed with Silva.

[¶] With respect to character witnesses, Blakely testified
he discussed the importance of having such witnesses with
Silva during his first meeting with him and also in a
conversation on the phone; according to Blakely he asked
Silva to think about finding witnesses to attest to his
truthfulness and have them contact Blakely a week or so
before trial.  Blakely also told Silva that such witnesses
would be subject to cross-examination, and a decision would
have to be made at some point as to whether the value of
their testimony might be outweighed by any undue prejudice
that might become involved in cross-examination.  Blakely
testified that Silva never gave him a list or phone call to
identify any of his potential character witnesses, and
ultimately he and Silva made a joint decision not to call
character witnesses in the 48 hours preceding his trial.
Although they talked about Silva's mother as a potential
character witness, Blakely told Silva he believed her
presence in the courtroom would be a benefit and Silva
decided he would rather have his mother sit in the courtroom
during the trial than be waiting outside as an excluded
witness.  Under the circumstances, Blakely felt no need to
hire a private investigator to undertake any further
investigation into the case.

[¶] "Whether to call certain witnesses is...a matter of
trial tactics, unless the decision results from unreasonable
failure to investigate."  (citation omitted.)  In order to
establish ineffective assistance based on an alleged failure
to investigate, a defendant "must show at the outset that
'counsel knew or should have known' further investigation
might turn up materially favorable evidence."  (citation

07cv0537

1  omitted.)  As for the failure to investigate a defense, the
2  defendant "must prove that counsel failed to make particular
   investigation and that the omissions resulted in the denial
3  of or inadequate presentation of a potentially meritorious
   defense." (citation omitted.)

4  [¶] Silva has not made the requisite showing here.  In
   particular, he does not explain in any meaningful way how
5  Silva's alibi defense as to Amy L., in view of all the other
   evidence and the alibi's potentially damaging impact, had
6  the potential of prevailing.  His reliance on *People v. Shaw*
   (1984) 35 Cal.3d 535 and *People v. Frierson* (1979) 25 Cal.3d
7  142 do[es] not assist him.  In those cases, counsel did not
   interview numerous alibi witnesses or consult with critical
8  experts, conduct which deprived counsel of a basis to make
   *informed* tactical and strategic trial decisions.  (citation
9  omitted.)  To the contrary here, Blakely's testimony at the
   hearing on Silva's new trial motion, which the trial court
10 expressly accepted over Silva and the other witnesses,
   demonstrates that Blakely's decision not to call either
11 Emily Silva or Cara Silva as witnesses or present an alibi
   defense was informed; it was made after interviewing those
12 individuals and discussing strategy with Silva, and it was
   therefore a reasonable tactical decision within the scope of
13 competent representation.  Under this record, Blakely
   undertook an adequate investigation, which defeats Silva's
14 claim of constitutionally ineffective assistance.

15 [¶] Even assuming counsel's performance was deficient in all
   of the respects Silva claims, the jury still would have
16 heard the strongest evidence of his guilt as to the Amy L.
   charges.  That is, the jury would have learned that DNA
17 matching Silva's profile taken from the Cynthia B. case was
   present in the Band-aid found in Amy L.'s room after the
18 assault.  It is within the context of this strong
   circumstantial evidence demonstrating Silva committed the
19 offenses against Amy L. that we consider whether he could
   establish prejudice, assuming counsel was deficient in all
20 of the respects he alleges.

21 [¶] Under the circumstances, taking into account not only
   the DNA evidence, but the strength of both Cynthia B. and
22 Amy L.'s testimony and the corroborating testimony of the
   nurse as to their injuries, we conclude it is not reasonably
23 probable Silva would have received a more favorable result
   if his counsel had presented the additional defense
24 witnesses and dubious (and potentially damaging) alibi
   defense that Silva asserts should have been advanced.
25 Whether we consider the alleged deficiencies individually or
   cummulatively, Silva has not demonstrated resulting
26 prejudice.  He has not carried his burden on appeal to show
   he was denied his right to effective assistance of counsel.

27

28 (Lodgment No. 6 at 12, 14-19.)

07cv0537

**(1) The state court's decision was not contrary to or an unreasonable application of clearly established federal law.**

The state appellate court's opinion was not "contrary to" clearly established federal law because it neither "applie[d] a rule that contradicts the governing law set forth in [United States Supreme Court] cases" nor "confront[ed] a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrive[d] at a result different from [the Supreme Court's] precedent." Williams, supra, 529 U.S. at 405-06.  The rule applied by the state appellate court in determining whether counsel was constitutionally ineffective was the exact standard adopted in federal law. (See Lodgment No. 6 at 12.)

Neither did the California Court of Appeal's decision involve an unreasonable application of federal law.  In deciding whether Petitioner made a sufficient showing that counsel's representation was deficient and that prejudice had resulted, the California Court of Appeal noted that Petitioner did not show (1) how counsel's actions were deficient or (2) why the outcome of the trial would have been different had counsel not been derelict in the five ways Petitioner contends. (See Lodgment No. 6 at 14, 18; See Strickland, supra 466 U.S. at 688, 690, 692, 694.)  The California Court of Appeal's decision was not an unreasonable application of Strickland if Petitioner made an insufficient showing on either one of these two prongs.  Strickland, supra, 466 U.S. at 687.  Moreover, mere conclusory allegations, unsupported by specific facts, cannot amount to a sufficient showing.  James, supra, 24 F.3d at 26.

07cv0537

In his Petition, Petitioner merely states "[c]ounsel failed to discuss any case strategy or case proceeding with the defendant; failed to disclose a tape prosecution had of telephone conversation with victim Cynthia B.; never hired any investigators to investigate witnesses or charges; never...presented alibi witnesses to Amy L. charges; and never called character witnesses." (Petition, Ground Two.)  Petitioner does not even attempt to develop any meaningful arguments to support these contentions and fails to show why these alleged deficiencies amounted to a violation of his constitutional rights.  (<u>See</u> <u>id.</u>)  Petitioner's conclusory allegations that counsel was ineffective, without specific facts supporting these contentions, are insufficient to merit habeas relief.  <u>Id.</u> Respondent correctly notes that Petitioner has failed to show counsel's performance was deficient and that prejudice resulted. (Answer at 16.)  Petitioner has made an insufficient showing on both prongs of the <u>Strickland</u> analysis regarding each of his contentions; thus, Petitioner fails to show that the California Court of Appeal's decision was an unreasonable application of the standard set forth in <u>Strickland</u>.

**(2) The state court's decision was not an unreasonable determination of the facts in light of the evidence presented.**

Because the California Court of Appeal's decision was not contrary to, or an unreasonable application of, federal law, the only remaining issue is whether the California Court of Appeal made an unreasonable determination of the facts in denying Petitioner's ineffective assistance of counsel claims.

///

07cv0537

1    **(a) <u>failure to consult Petitioner regarding trial strategy</u>**

2         First, Petitioner contends that Mr. Blakely was

3    constitutionally ineffective because he failed to consult with

4    Petitioner regarding trial strategy. (Petition, Ground Two.)

5    For purposes of this analysis, the Court assumes that Petitioner

6    specifically contends that Mr. Blakely should have consulted him

7    regarding alibi witnesses, should have consulted him about the

8    significance of the motion for severance and should have

9    encouraged him to testify in defense of the Amy L. charges. (<u>See</u>

10   Lodgment No. 3 at 33; RT at 549/62-65.)

11        Mr. Blakely testified during the hearing on Petitioner's

12   motion for new trial that he interviewed the potential alibi

13   witnesses suggested by Petitioner and talked with him extensively

14   about the potential drawbacks involved. (RT at 549/89, 549/96-

15   99; CT at 227.) Ultimately, Mr. Blakely determined that it was

16   against Petitioner's best interests to present them. (RT at

17   549/99.) Mr. Blakely also testified that he discussed the

18   significance of the motion for severance at length with

19   Petitioner and that Petitioner was "very, very happy" with the

20   result.[6] (RT at 549/91-92, 549/122.)

21        Because Petitioner's and Mr. Blakely's testimony was

22   diametrically opposed, the issue of whether Mr. Blakely

23   completely failed to discuss trial strategy with Petitioner

24   turned on a credibility assessment of the two. (RT at 555;

25   Lodgment No. 6 at 15.) In denying Petitioner's motion for new

26   _____

27        [6] As discussed above, the trial court ruled that Petitioner would
     be entitled to testify in defense of the Cynthia B. charges without
28   subjecting himself to cross-examination on the Amy L. charges. (RT at
     37-38.)

07cv0537

1  trial, the trial court noted, "I am persuaded by [counsel's]

2  testimony... Your client [Petitioner] is not a credible witness.

3  He was a terrible witness at trial.  He was not a good witness

4  here, either."  (RT at 564-65; Lodgment No. 6 at 15.)  This Court

5  will not second-guess the trial court's credibility determination

6  because the trial court was in a better position to make

7  credibility assessments of the witnesses.  Ornelas v. United

8  States, 517 U.S. 690, 701 (1996) (noting that an appellate court

9  never has the benefit of the trial court's familiarity with the

10 details of the case, nor the benefit of hearing live testimony).

11 Thus, the record supports a finding that counsel sufficiently

12 discussed trial strategy and the significance of the motion for

13 severance with Petitioner.

14      Moreover, even if Petitioner had set forth specific facts

15 showing that counsel's performance was deficient, based on the

16 strong circumstantial evidence in the case, it would have been

17 virtually impossible for Petitioner to show that the outcome of

18 the trial would have been different.  Strickland, supra, 466 U.S.

19 at 668, 688, 690, 692, 694.  Petitioner ignores the fact that

20 circumstantial evidence alone is sufficient to support a

21 conviction, and the jury was so instructed.  (CT at 131; CALJIC

22 2.00.)  Circumstantial evidence, including Petitioner's DNA

23 obtained from each crime scene, as well as the strong testimony

24 of both Cynthia B. and Amy L., independently supported a finding

25 of guilt.  (RT at 228, 560,72-111, 140-66.)  Thus, the record

26 supports a finding that Petitioner was not prejudiced by Mr.

27 Blakely's performance, and the claim should be denied.

28 ///

07cv0537

**(b) <u>failure to disclose taped conversation</u>**

Petitioner contends that Mr. Blakely was constitutionally ineffective because he failed to disclose to Petitioner a taped telephone conversation between Petitioner and Cynthia B. which took place after Cynthia B.'s rape.  (Petition, Ground Two.)  The District Attorney questioned Petitioner about the tape during trial.  (<u>See</u> RT at 299-301; <u>see also</u> Lodgment No. 3 at 33.)

The problem with Petitioner's contention, however, is that neither the tape nor Petitioner's responses to the prosecutor's questions were damaging to Petitioner's defense.  On the tape, Petitioner and Cynthia B. engage in a friendly conversation. Petitioner even tells Cynthia B. his last name and where he lives.  (RT at 379.)  Mr. Blakely was able to use the tape to Petitioner's benefit.  In his closing argument, Mr. Blakely argued, "Does this sound at all like the voice of a woman who thinks that this man may be the person who [raped her]?"  (<u>Id.</u>) Mr. Blakely argued that giving personal information to Cynthia B. did not make sense if Petitioner had just committed violent, forcible rape on her.  (<u>Id.</u>)  Thus, the record supports a finding that counsel was not deficient in failing to disclose the tape.

Moreover, even if Petitioner had set forth specific facts showing that counsel's performance was deficient, given the strong circumstantial evidence supporting Petitioner's guilt (as discussed above), there is no reasonable likelihood that had Mr. Blakely disclosed the tape, Petitioner would have been acquitted of any crimes charged.  <u>Strickland</u>, <u>supra</u>, 466 U.S. at 688, 690, 692, 694.  Thus, the record supports a finding that Petitioner was not prejudiced by Mr. Blakely's performance, and the claim

07cv0537

1   should be denied.

2                   (c) <u>**failure to hire an investigator**</u>

3        Petitioner next contends that Mr. Blakely was

4   constitutionally ineffective because he failed to hire an

5   investigator to conduct a formal investigation into alibi and

6   character witnesses.  (Petition, Ground Two.)

7        During the hearing of the motion for new trial, Petitioner

8   testified that he gave Mr. Blakely the names, addresses and

9   telephone numbers of potential character witnesses.  (RT at

10  549/60.)  Mr. Blakely testified that he attempted to contact or

11  did contact each character witness.  (RT at 549/111, 549/106.)

12  He further testified that he talked with Petitioner about the

13  potential character witnesses, but that they jointly decided not

14  to call them to testify.[7]  (RT at 549/94-95.)  Additionally, Mr.

15  Blakely personally interviewed both of Petitioner's potential

16  alibi witnesses and assessed their helpfulness to Petitioner's

17  case.  (CT at 227, 231; RT at 549/109, 549/112.)  Because

18  Petitioner agreed not to call any character witnesses, and

19  because there were only two potential alibi witnesses, counsel

20  did not see the need to hire an investigator.  (RT at 549/108.)

21  Thus, the record supports a finding that counsel's decision not

22  to hire a private investigator was reasonable.

23       Moreover, even if Petitioner had set forth specific facts

24  showing that counsel's performance was deficient, given the

25  strong circumstantial evidence supporting Petitioner's guilt (as

26  discussed above), there is no reasonable likelihood that had Mr.

27  _____

28       [7] The specific reasons why this decision was made are discussed
    in subsection (e) below.

                                    32

07cv0537

1  Blakely hired a private investigator, Petitioner would have been
2  acquitted of any crimes charged.  <u>Strickland</u>, <u>supra</u>, 466 U.S. at
3  688, 690, 692, 694.  Thus, the record supports a finding that
4  Petitioner was not prejudiced by Mr. Blakely's performance, and
5  the claim should be denied.

6              **(d) <u>failure to present an alibi defense</u>**

7       Petitioner next contends that Mr. Blakely was
8  constitutionally ineffective because he failed to call potential
9  alibi witnesses and did not cross-examine Amy L. regarding drug
10 usage with Petitioner the night before the assault.  (Petition,
11 Ground Two.)

12      Petitioner gave Mr. Blakely the names of two alibi
13 witnesses: Emily Silva, his mother, and Cara Silva, his wife. (CT
14 at 227.)  During the hearing on Petitioner's motion for new
15 trial, Emily Silva testified that Petitioner was putting out a
16 kitchen fire during the early morning hours when Amy L. was
17 raped.  (RT at 549/4-5, 549/6.)  However, Emily Silva could only
18 account for roughly a half hour of Petitioner's whereabouts (from
19 4:30 a.m. to 5:00 a.m).  (RT at 549/11.)  Petitioner could have
20 raped Amy L. before or after the fire.  (<u>Id.</u>)  Cara Silva
21 testified that she and Petitioner were doing drugs, among other
22 things, at the time of the Amy L. rape.  (RT at 549/118.)
23 Counsel determined that Cara Silva was a useless witness because
24 she was homeless and severely addicted to methamphetamine.  (RT
25 at 549/98-99.)  Even more fundamentally, it was clear to counsel
26 that Cara Silva was lying.  (RT at 549/99.)

27      Presenting the alibi defense and cross-examining Amy L.
28 about using drugs with Petitioner the night before the assault

07cv0537

1   also was tactically troubling for Mr. Blakely.  Petitioner told

2   Mr. Blakely that he met Amy L. the night before the rape while

3   she was in a drunken stupor.  (RT at 549/88, 559.)  Amy L. got

4   into Petitioner's van to look for her car.  (RT at 549/88, 559-

5   60.)  Amy L. testified that the man driving her around told her

6   he was going to rape her.  (RT at 560.)  This was supported by a

7   recording of a 911 call in which Amy L. is crying hysterically,

8   reporting an attempted rape.  (RT at 549/89-90.)  Amy L. escaped,

9   leaving behind her keys to her apartment, her identification, and

10  her address in Petitioner's van.  (RT at 560, 576.)  Had Mr.

11  Blakely presented the alibi defense or cross-examined Amy L.

12  regarding the prior night's events, all of this evidence would

13  have come in and would have substantially supported the

14  prosecution's case against Petitioner.  (RT at 549/89.)

15  Additionally, because Petitioner's mother's house and Amy L.'s

16  apartment were mere blocks from each other, it was possible that

17  Petitioner had committed the rape, and then gone home immediately

18  and set fire to the house to make it appear as if he had never

19  left.  (RT at 549/126-27, 549/65.)  Thus, the record supports a

20  finding that counsel's decision not to call alibi witnesses was

21  tactically reasonable.  _Strickland_, _supra_, 466 U.S. at 690.

22       Moreover, even if Petitioner had set forth specific facts

23  showing that counsel's performance was deficient, given the

24  strong circumstantial evidence supporting Petitioner's guilt (as

25  discussed above), there is no reasonable likelihood that had Mr.

26  Blakely presented the alibi defense, Petitioner would have been

27  acquitted of any crimes charged.  _Strickland_, _supra_, 466 U.S. at

28  688, 690, 692, 694.  As the California Court of Appeal noted,

07cv0537

counsel's tactical decisions not to call witnesses who were useless or potentially damaging to Petitioner's case was not objectively unreasonable. (Lodgment No. 6 at 18.) Such "tactical decisions are virtually unchallengeable." <u>Strickland</u>, <u>supra</u>, 466 U.S. at 690. Thus, the record supports a finding that Petitioner was not prejudiced by Mr. Blakely's performance, and the claim should be denied.

### (e) <u>failure to present defense character witnesses</u>

Lastly, Petitioner contends that Mr. Blakely was constitutionally ineffective because he failed to present character witnesses who would have made a difference in the trial's outcome. (Petition, Ground Two.)

During an initial interview, Mr. Blakely instructed Petitioner to think of anyone who would be able to testify to Petitioner's character for truthfulness. (RT at 549/93.) Petitioner gave counsel several names of potential character witnesses. (RT at 549/60.) Mr. Blakely chose not to interview potential character witness Karina Vaught because Cara Silva provided him with the name, and counsel believed it was a mistake. (RT at 549/111.) He tried to call another potential character witness, Jennifer Carter, but the number was disconnected. (RT at 549/106.) Mr. Blakely spoke with the remaining two potential character witnesses, Cara Silva and Emily Silva. (RT at 549/109, 549/112.) Mr. Blakely felt that the only witness worth calling was Emily Silva. (RT at 549/95.) However, because Emily Silva was Petitioner's mother, it would be in Petitioner's best interest to have her present in the courtroom, rather than waiting outside as an excluded witness.

07cv0537

1  (Id.)  After discussing that the other character witnesses would

2  be subject to risky cross-examination (given their backgrounds),

3  counsel and Petitioner decided it was not in Petitioner's best

4  interests to call them.  (RT at 549/94-95.)  Thus, the record

5  reflects that Mr. Blakely and Petitioner decided together that

6  calling any of the character witnesses would be tactically unwise

7  and this Court will not second-guess counsel's tactical

8  decisions.  Strickland, supra, 466 U.S. 690.

9      Moreover, even if Petitioner had set forth specific facts

10  showing that counsel's performance was deficient, given the

11  strong circumstantial evidence supporting Petitioner's guilt (as

12  discussed above), there is no reasonable likelihood that had Mr.

13  Blakely presented the character witnesses, Petitioner would have

14  been acquitted of any crimes charged.  Strickland, supra, 466

15  U.S. at 688, 690, 692, 694.  Thus, the record supports a finding

16  that Petitioner was not prejudiced by counsel's performance, and

17  the claim should be denied.

18      After a thorough and independent review of the record, this

19  Court finds the California Court of Appeal's denial of

20  Petitioner's ineffective assistance of counsel claims was not

21  contrary to or an unreasonable application of clearly established

22  federal law, nor was the decision based on an unreasonable

23  determination of the facts.  28 U.S.C. § 2254(d)(1)-(2).

24  Petitioner failed to make any showing whatsoever that he received

25  constitutionally ineffective assistance of counsel.  The record

26  supports a finding that counsel's performance was reasonable and

27  that Petitioner was not prejudiced by Mr. Blakely's performance.

28  Thus, the claim should be denied.

07cv0537

**V.    Recommendation**

After a thorough review of the record in this matter, the undersigned magistrate judge finds that Petitioner has not shown that he is entitled to federal habeas relief under the applicable legal standards.   Therefore, the undersigned magistrate judge hereby recommends that the Petition be **DENIED WITH PREJUDICE** and that judgment be entered accordingly.

This Report and Recommendation is submitted to the Honorable William Q. Hayes, United States District Judge assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).

**IT IS ORDERED** that not later than **April 30, 2008**, any party may file written objections with the Court and serve a copy on all parties.   The document should be captioned "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be served and filed not later than **May 14, 2008**.   The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's order.   See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998); Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

**IT IS SO ORDERED.**

DATED:   March 28, 2008

Jan M. Adler
U.S. Magistrate Judge

37

07cv0537